IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSLYN D. HOLLOWAY,         :         CIVIL ACTION
          :
Plaintiff,                  :
          :
        v.             :
          :
ANDREW SAUL,[1]         :         NO. 19-392
Commissioner of Social Security,  :
          :
        Defendant.     :


**MEMORANDUM OPINION**

Joslyn D. Holloway ("Holloway or "Plaintiff") seeks review, pursuant to 42 U.S.C.

§ 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying her

claims for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act

(the "Act") and for Supplemental Security Income ("SSI") pursuant to Title XVI of the Act. [2]

For the reasons discussed below, I recommend that her Request for Review be denied.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Holloway was born on June 5, 1988.  R. at 208.[3]  She has a high school education, id. at

212, and is able to speak, read and understand English, id. at 210.  Holloway's past relevant work

experience was as a home healthcare aide and as a housekeeping cleaner.  Id. at 213.  She

---

[1]    Andrew Saul, the current Commissioner of Social Security, has been automatically
substituted as the Defendant in this case pursuant to Fed. R. Civ. P. 25(d).

[2]    In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the
undersigned United States Magistrate Judge conduct proceedings in this case, including the entry
of final judgment.  See Doc. Nos. 6, 7.

[3]    Citations to the administrative record will be indicated by "R." followed by the page number.

applied for DIB and SSI on September 29, 2015, id. at 14, alleging that she became disabled on

July 28, 2015 due to the following conditions: "obesity, bipolar disorder, memory loss, acute

post[-]stress disorders, acute post[-]traumatic headaches, major depression, dysthymic disorders,

obsessions—worry, withdrawn, hostile," id. at 211. At the time of her applications, Holloway

was approximately 27 years old. Id. at 27. Holloway's applications were initially denied on

May 27, 2016. Id. at 77-89, 90-102. She filed a written request for a hearing, id. at 119-20, and

an ALJ held a hearing on her claim on February 27, 2018, id. at 36-76. On May 30, 2018, the

ALJ issued an opinion denying Holloway's claim. Id. at 14-28. Holloway filed an appeal with

the Appeals Council, which it denied on December 17, 2018, thereby affirming the decision of

the ALJ as the final decision of the Commissioner. Id. at 1-7. Holloway then commenced this

action in federal court.

## II.   THE ALJ'S DECISION

In her decision, the ALJ found that Holloway suffered from severe impairments due to:

lumbar spine degenerative disc disease, left knee joint disease, diabetes mellitus, obesity, bipolar

disorder, depression, intellectual impairment and cannabis use disorder. Id. at 16. The ALJ

determined that none of Holloway's impairments, nor the combination of her impairments, met

or medically equaled a listed impairment. Id. at 17-21. The ALJ found that Holloway had the

residual functional capacity ("RFC") to perform:

> Sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), meaning she
> can lift and carry ten pounds occasionally, lift and carry less than ten pounds
> frequently, sit for six hours, and stand and walk for two hours in and eight-hour
> workday. However, she can only frequently operate foot controls bilaterally. She
> can occasionally climb ramps and stairs, balance, and stoop but never kneel,
> crouch, crawl, or climb ladders, ropes, or scaffolds. The claimant has no
> reaching, handling, fingering, feeling, visual or communicative limitations.
> Additionally, she can never work at unprotected heights and have only occasional
> exposure to moving mechanical parts, humidity, wetness, extreme cold and heat,
> and vibration. The claimant is also limited to simple routine tasks, and simple

work-related decisions. She can occasionally interact with the public, supervisors, and coworkers.

Id. at 21. Relying on the testimony of the vocational expert ("VE") who appeared at the hearing, the ALJ determined that Holloway was capable of performing the following occupations: type-copy examiner, final assembler and table worker. Id. at 27. Accordingly, the ALJ found that Holloway was not disabled and denied her claim. Id. at 28.

## III.    HOLLOWAY'S REQUEST FOR REVIEW

In her Request for Review, Holloway asserts that the ALJ erred in: (1) failing to give controlling weight to the opinion of her treating orthopedist; (2) failing to give controlling weight to the opinion of her treating mental health providers; and (3) failing to properly analyze the limitations imposed by her obesity. In addition, Holloway argues that the Appeals Council erred in deciding that the additional evidence she submitted after the ALJ had issued her opinion did not warrant a remand to the ALJ for further consideration.

## IV.    SOCIAL SECURITY STANDARD OF REVIEW

The role of the court in reviewing an administrative decision denying benefits in a Social Security matter is to uphold any factual determination made by the ALJ that is supported by "substantial evidence." 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). A reviewing court may not undertake a de novo review of the Commissioner's decision in order to reweigh the evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). The court's scope of review is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's finding of fact." Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001).

Substantial evidence is a deferential standard of review.  See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988)); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  The court's review is plenary as to the ALJ's application of legal standards.  Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

To prove disability, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period.  42 U.S.C. § 1382c(a)(3)(A); accord id. § 423(d)(1).  As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirements in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920 (references to other regulations omitted).

## V.    **DISCUSSION**

### A.    **The Standard for Review of Opinions of Treating Physicians**

Holloway focuses her attacks on the ALJ's decision, regarding both her physical RFC and mental RFC, on her contention that the ALJ was required to afford the opinions of her treating physicians controlling weight. See Pl.'s Br. (Doc. No. 11) at 2. However, the rules in effect at the relevant time,[4] which afforded additional weight to the opinions of treating physicians, were not as categorical as Holloway portrays them to be. Applying the pre-2017 rules, the medical opinions of a treating physician "are entitled to substantial and at times even controlling weight." Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527[(c)](2)). A treating physician's opinion on the nature and severity of a claimant's impairment will be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). In rejecting a treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments,

---

[4]    The Commissioner made "sweeping changes" to the rules regarding the evaluation of medical opinion evidence that became effective on March 17, 2017. Lepperd v. Berryhill, No. 3:16-CV-02501, 2018 WL 1571954, at *6 n.10 (M.D. Pa. Feb. 20, 2018) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017)), report and recommendation adopted, No. 3:16-CV-2501, 2018 WL 1566662 (M.D. Pa. Mar. 30, 2018). Those changes abandoned the treating-physician rule. See 20 C.F.R. § 404.1520(c). Although a physician's relationship with the claimant and the length of the treating relationship are still relevant considerations under the revised rules, id. § 404.1520c(c)(2), (3), those rules make the "most important factors" in considering a physician's opinion its supportability and consistency with the evidence, id. § 404.1520c(a). Because the revised rules only apply to claims filed on or after March 27, 2017, id. § 1520(c), they are not applicable to Holloway's claim.

speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000) (internal

quotation marks omitted). Furthermore, the ALJ must explain on the record his or her reasons

for disregarding a treating physician's opinion. Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir.

1986). It cannot be for "no reason or for the wrong reason." Morales, 225 F.3d at 317 (internal

quotations marks omitted).

An ALJ may decide not to credit a treating physician's opinion, however, if he or she

provides an adequate explanation. Sherrod v. Barnhart, No. 01-4731, 2002 WL 31429337, at *3

(E.D. Pa. Oct. 29, 2002). For example, an ALJ may reject a treating physician's opinion when it

is not supported by sufficient clinical data. Newhouse, 753 F.2d at 286; see also Salles v.

Comm'r of Soc. Sec., 229 F. App'x 140, 148 (3d Cir. 2007) ("A lack of evidentiary support in

the medical record is a legitimate reason for excluding claimed limitations from the RFC.").

"[T]he United States Court of Appeals for the Third Circuit has also repeatedly held that when a

treating physician's notes, analyzed as a whole, contradict the physician's opinion on a

claimant's ability to work, an ALJ may properly rely on those notes in determining that the

opinion is entitled to little or no weight." Smith v. Astrue, 961 F. Supp. 2d 620, 643 (D. Del.

2013) (citing Dula v. Barnhart, 129 F. App'x 715, 719 (3d Cir. 2005)); accord Humphreys v.

Barnhart, 127 F. App'x 73, 76 (3d Cir. 2005); Shelton v. Astrue, No. 11-75J, 2012 WL 3715561,

at *3 (W.D. Pa. Aug. 28, 2012); Petrowsky v. Astrue, No. 10-563, 2011 WL 6083117, at *14-15

(D. Del. Dec. 6, 2011). Moreover, an ALJ may reject a treating physician's opinion in favor of

that of a non-examining physician if the latter opinion is more consistent with the evidence.

Salerno v. Comm'r of Soc. Sec., 152 F. App'x 208, 209 (3d Cir. 2005); Hudson v. Comm'r of

Soc. Sec., 93 F. App'x 428, 431 (3d Cir. 2004).

Furthermore, where a physician fails to provide an explanation supporting his or her

opinion, that "by itself would justify the ALJ's decision to accord [it] little weight."

Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 119 (3d Cir. 2012); see also Plummer v.

Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (opinion may be given "more or less weight depending

upon the extent to which supporting explanations are provided"). This is especially the case

when the opinion is provided in a form "which require[s] only that the completing physician

'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions

stated." Smith, 359 F. App'x at 316 (quoting Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir.

1993)). Such forms provide "'weak evidence at best' in the context of a disability analysis." Id.;

see also Wise v. Comm'r of Soc. Sec., 626 F. App'x 357, 360 (3d Cir. 2015) ("[W]e have said

that ALJs are not required to give any weight to these fill-in-the-blank and checklist portions of

RFC assessments and that their focus instead should be on the narrative portions of the

assessments where the medical experts expound on their opinions.").

Ultimately, however, determining a claimant's RFC is the province of the ALJ and not of

the treating physician. An ALJ is required to conduct an independent analysis of the relevant

evidence and to reach his or her own determination regarding the claimant's RFC. Chandler v.

Comm'r Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). As the United States Court of Appeals for

the Third Circuit has articulated:

> The ALJ—not treating or examining physicians or State agency consultants—
> must make the ultimate disability and RFC determinations. See 20 C.F.R. §§
> 404.1527(e)(1), 404.1546(c). Although treating and examining physician opinions
> often deserve more weight than the opinions of doctors who review records, see,
> e.g., 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear . . . that the opinion of a
> treating physician does not bind the ALJ on the issue of functional capacity . . . ."

Id. (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Thus, the ALJ's role is not

merely to choose between the opinions of various medical sources. "There is no legal

requirement that a physician have made the particular findings that an ALJ adopts in the course

of determining an RFC. Surveying the medical evidence is part of the ALJ's duties."

Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); see also Chandler, 667 F.3d at 362

(ALJ could extrapolate based on evidence in record because every fact incorporated in an RFC

does not need to have been found by a medical expert); Mays v. Barnhart, 78 F. App'x 808, 813

(3d Cir. 2003) (ALJ properly determined that claimant could perform light work based on

claimant's treatment records even though the only medical opinion in the case was to the

contrary); Kertesz v. Crescent Hills Coal Co., 788 F.2d 158, 163 (3d Cir. 1986) (reaching the

same conclusion in a case reviewing an ALJ's determination of eligibility for benefits under the

Black Lung Benefits Act).

### B. The ALJ's RFC Findings Regarding Holloway's Physical Limitations Were Supported by Substantial Evidence

Holloway contends that the ALJ erred in not giving controlling weight or, at the least,

great weight, to the physical limitations stated in the opinion of her orthopedist, Dr. Corey Ruth.

Pl.'s Br. at 2, 20-21. Holloway sought treatment from Dr. Ruth after she was injured in a

collision that occurred while she was riding on a bus in July 2015. R. at 544. Dr. Ruth

submitted responses to interrogatories posed to him by the ALJ. Id. at 730-32. In his responses,

Dr. Ruth identified Holloway's course of treatment as including injections, Naprosyn (Naproxen)

and Flexeril as well as physical therapy. Id. He did not prescribe narcotic painkillers. Id.; see

also id. at 542-56 (Dr. Ruth's treatment records). He further indicated that Holloway was not a

candidate for surgery at the time. Id. at 730. Dr. Ruth stated that Holloway was obese and

answered affirmatively to a question asking whether "the pain the patient suffered on

weightbearing activities such as standing or walking or lifting and carrying [was] exacerbated by

her weight." Id. at 731. He opined that, in an eight-hour workday, Holloway could only stand

for a total of one hour and could only sit in a regular straight-back chair for a total of two hours.

Id. He further indicated that the most that she could "lift and carry on an occasional basis (a couple of times an hour)" was 10 pounds. Id. Dr. Ruth also answered affirmatively to an interrogatory asking whether Holloway had been precluded for the period from July 2015 to the time of his interrogatory responses on May 24, 2017, from performing unskilled work requiring her to travel to and from the worksite, sit for a total of six hours in a regular straight-back chair, stand for up to two hours and carry up to 10 pounds in weight for up to two hours.[5] Id. at 732. He also stated that Holloway would be off-task for 40 percent of an eight-hour workday. Id.

Dr. Ruth's treatment records and opinion are problematic for several reasons. His treatment notes were recorded on a form that does not appear to have been fully updated from visit to visit. Thus, each of Dr. Ruth's notes on each of his physical examinations of Holloway state as to his clinical findings the following vague, generic description: "tenderness to palpitation of over [sic] spinous processes, PSIS, sacroiliac joints, or par spinal [sic] musculature," and "[p]atient reports slight pain w/ R.O.M.," and those findings are repeated verbatim for each examination, including the typographical errors. Id. at 545, 547, 550, 552, 555, 795, 798, 801, 804, 807. Dr. Ruth included the language regarding only slight pain with range of movement and slight muscle weakness in Holloway's leg even at times when Holloway reported her pain as high as 8-9 on a 10-point scale. Id. at 547, 550, 555, 795, 798. His interrogatory responses contain no explanation of the basis for his opinions. See id. at 730-32. Dr. Ruth stated on a number of occasions that he intended to "continue conservative care and

---

[5]    This question incorporates the requirements for sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Although sedentary work does require some standing and carrying, those activities are limited to no more than "about two hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

home exercises." Id. at 549, 554, 794, 797, 806.  Accordingly, he treated Holloway with monthly trigger-point injections and prescribed only Flexeril, a muscle relaxant, and Naproxen. Id. at 730.  When Holloway found her medications to be ineffective, he instructed her to take Extra Strength Tylenol instead.  Id. at 48, 807-08.

Similarly, Dr. Ruth's form used for each of Holloway's examinations included the following legend at the bottom: "Plan: home exercises, ice, elevation, and rest, analgesics return for f/u in 4-6 weeks."  Id. at 545, 547, 550, 553, 555, 795-96, 799, 802, 805, 808.[6]  He gave no indication of the frequency with which he believed Holloway should elevate her legs, although the fact he recommended exercises and the fact he sent her to physical therapy, see, e.g., id. at 546, indicate that he did not require her to elevate them all of the time.  Moreover, even when Dr. Ruth had additional plans specific to Holloway, he added those plans as a separate entry under a separate legend for "Plan" immediately preceding the standard "Plan" legend, but did not alter the standard form language that appeared at the bottom of each treatment note or combine it with his additional "Plan[s]."  See id. at 545, 552-53, 807-08.

Dr. Ruth was similarly sparse in his responses to the ALJ's interrogatories.  Despite the extreme limitations that he assigned to Holloway, which would have precluded her from performing even sedentary work, he provided no explanation of the basis for his assigned limitations other than a diagnosis of "L3-S1 herniated disc and sciatica."  Id. at 730-32.  That failure "by itself" justified the ALJ's decision to afford Dr. Ruth's opinion little weight. Cunningham, 507 F. App'x at 119; see also Wise, 626 F. App'x at 360 (directing reviewing

---

[6]    For the very last examination on record, Dr. Ruth added to that legend the words "conservative treatment."  R. at 808.

courts to focus on the sufficiency of the "narrative portion of [physicians'] assessments where the medical experts expound on their opinions").

Moreover, the ALJ also had before her the report and opinion of a consultative examiner, Dr. Joel Marmar. R. at 417-26. Dr. Marmar examined Holloway on March 16, 2016. Id. She reported to him that, despite receiving injections and physical therapy, her low-back pain continued to cause her pain daily, ranging in intensity from a five to a nine on a 10-point scale. Id. at 417. She further reported that she had to ascend 23 steps from the sidewalk to reach her bedroom, she could walk one block, and she took public transportation but did not drive. Id. Holloway also reported that she could cook, clean, shower and dress herself, but she needed help with shopping and laundry because they put strain on her back. Id. at 418. As to his clinical examination of Holloway, Dr. Marmar noted that she "appear[ed] to be in no acute distress," her gait was normal, she could stand on heels and toes and could perform 40 percent of a full squat. Id. He further noted that she did not need an assistive device to walk, needed no help in changing for the examination or getting on and off the examination table and was able to rise from a chair without difficulty. Id. Dr. Marmar found as to her musculoskeletal system that she had "[n]o scoliosis, kyphosis, or abnormality in the thoracic spine" and that seated leg-raise testing was negative bilaterally. Id. at 419. Holloway's joints had no deformity or tenderness or any redness, heat or effusion. Id. Her extremities had no cyanosis, clubbing or edema, her reflexes were physiological and equal in her upper and lower extremities and her strength was "5/5" in both. Id. Dr. Marmar opined that Holloway could lift and carry up to 20 pounds frequently but could never lift more than 20 pounds. Id. at 421. He further indicated that she could sit or stand for up to four hours at a time each, but that she could only walk continuously

for one hour. He stated that, in an eight-hour workday, she could sit or stand for up to seven hours each but could only walk for a total of two hours. Id. at 422.

Before reaching her decision, the ALJ extensively examined Holloway's treatment records and her subjective allegations regarding her back problems. See id. at 21-24. In analyzing Holloway's physical limitations, the ALJ accepted Dr. Ruth's opinions as to Holloway's limitations on standing and walking because she found them consistent with Holloway's treatment records, "which document consistent back pain despite treatment." Id. at 24. Although she did not specifically address Dr. Ruth's opinion that Holloway could not sit for a total of more than two hours in a day in the portion of her decision discussing Dr. Ruth's findings, she did address Holloway's physical limitations again later in her decision. Id. at 26. In summarizing her findings regarding Holloway's physical limitations, the ALJ acknowledged that Holloway had undergone consistent treatment since her injury during the accident in July 2015. Id. She noted, however, that Holloway's records reflected that her treatment was limited to medication, physical therapy and lumbar injections and that she had not required surgery. Id. In other words, as Dr. Ruth had stated repeatedly, her treatment remained conservative. Id. at 549, 554, 794, 797, 806. The ALJ also noted that, even when Holloway experienced an exacerbation of her back pain in November 2015, her range of motion remained full, her gait remained normal, and physical examination revealed only moderate tenderness. Id. at 22. Indeed, the record is devoid of evidence of Holloway ever needing the use of an assistive device in walking or of developing an abnormal gait. Nevertheless, taking into account Holloway's subjective allegations regarding her symptoms, even though she found them to be "not entirely consistent with the medical evidence" and with Holloway's daily activities, id., the ALJ determined that Holloway should be limited to sedentary work, id. at 26. By definition, that

exertion level would require Holloway to be able to sit for six hours in a day. SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). The ALJ reasoned that the "clinical findings in evidence document[ed] that she maintained a normal gait and the diagnostic imaging revealed only mild to moderate issues."[7] R. at 24

The ALJ's view that the clinical findings were inconsistent with greater limitations than those that apply to sedentary work is supported by Dr. Ruth's repeated findings on physical examination that Holloway had only "tenderness to palpitation of over [sic] spinous processes, PSIS, sacroiliac joints, or par spinal [sic] musculature." Id. at 545, 547, 550, 552, 555, 795, 798, 801, 804, 807. Insufficient clinical findings to support an opinion regarding a claimant's limitations justifies an ALJ's rejection of a treating physician's opinion. Newhouse, 753 F.2d at 286. The ALJ also noted that, even when Holloway experienced an exacerbation of her back pain in November 2015, her range of motion remained full and her gait remained normal, and physical examination revealed only moderate tenderness. R. at 22. Indeed, the record is devoid

---

[7] Hollloway argues that the ALJ failed to comprehend the extent of her back injury because "the ALJ only considered [her] lumbar[-]related impairment to be degenerative disc disease." Pl.'s Br. at 19. To support this contention, she points to the ALJ's shorthand description of her lumbar impairment in her list of severe impairments at step two of the analysis as "lumbar spine degenerative disc disease." Id. Given that the purpose of step two is solely to determine if an impairment is "severe" or "non-severe" as "a *de minimis* screening device to dispose of groundless claims," Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (emphasis in original), and that the ALJ found Holloway's lumbar impairment to be severe, R. at 16, it was unnecessary for the ALJ to specify the precise extent of the impairment at that stage in the analysis. In her discussion of Holloway's impairment at step four for the purposes of determining Holloway's RFC, the ALJ recognized that an MRI of Holloway's lumbar spine "revealed multilevel broad[-]based disc herniation with mild to moderate canal stenosis" and cited to the MRI report on which Holloway bases her argument. Id. at 22 (citing id. at 363-64). Thus, Holloway's contention that the ALJ misunderstood her condition to involve solely degenerative disc disease is meritless.

of evidence of Holloway ever needing the use of an assistive device in walking or of developing an abnormal gait.

The ALJ's decision not to fully adopt Dr. Ruth's opinion also is consistent with Dr. Ruth's decision to give Holloway only conservative treatment. "The extent of treatment prescribed is a factor that the applicable regulations instruct ALJ's to consider in evaluating claimants' subjective testimony regarding the extent of their symptoms." Gladden o/b/o Hyman-Self v. Berryhill, No. 17-1832, 2018 WL 1123763, at *8 (E.D. Pa. Feb. 28, 2018) (citing 20 C.F.R. § 404.1529); Proper v. Astrue, No. 10-238 ERIE, 2011 WL 5360296, at *10 (W.D. Pa. Nov. 7, 2011).

In addition, although the ALJ did not accept the findings of the consultative examiner, Dr. Marmar, that Holloway could sit for up to seven hours in a workday, his opinion provided medical evidence contrary to Dr. Ruth's opinion and provided additional evidentiary support for the ALJ's decision not to fully credit Dr. Ruth's opinion. Northington v. Berryhill, No. 17-2922, 2018 WL 2159923, at *1 n.1 (E.D Pa. May 10, 2018); see also Lewis v. Berryhill, No. CV 17-2270, 2018 WL 3447177, at *4 (E.D. Pa. July 17, 2018) (finding that an ALJ's RFC determination was supported by "an opinion which, if fully accepted, supported a less restrictive RFC than that assessed by the ALJ"); Armbruster v. Colvin, No. 14-CV-3026, 2016 WL 5930913, at *7 (E.D. Pa. Oct. 12, 2016) (same). An ALJ is not required to adopt or reject each of the specific limitations a physician deems necessary regardless of the weight he or she gives to the physician's opinion as a whole. See Wilkinson v. Comm'r of Soc. Sec., 558 F. App'x 254, 256 (3d Cir. 2014); ("[N]o rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight."); accord Pascarello v. Berryhill, No. 18-3406, 2019 WL 2288233, at *8

(E.D. Pa. May 28, 2019); Northington, 2018 WL 2159923, at *1 n.1; Lucas v. Berryhill, No. 17-3005, 2018 WL 6737376, at *3 (E.D. Pa. Nov. 20, 2018).

The ALJ's determination that Dr. Ruth's opinion was not supported by Holloway's activities of daily living, see R. at 24, also is supported by the record. Her finding that Holloway's ability to care for her eight-year-old daughter was not consistent with Dr. Ruth's opinion that she was incapable of performing even sedentary work was reasonable, notwithstanding the fact she received assistance from her mother, who lived with her. Id. Other activities that the ALJ noted included Holloway's ability to regularly travel to medical appointments and physical therapy by public transportation without accompaniment or assistance. Id. Moreover, although the ALJ did not further elucidate the daily activities that she found inconsistent with the extreme limitations set out in Dr. Ruth's opinion, the record contains additional evidence regarding Holloway's daily activities that supports her finding. For example, there were 23 steps between Holloway's bedroom and the sidewalk, id. at 417, but she reported that she still left her home daily, id. at 233. Furthermore, the treatment notes of her psychotherapist, April Morgan, recorded statements by Holloway that she took "brisk walks" around a local track as a "coping strategy used to manage her mood-stated [sic]." Id. at 643; see also id. at 635 (Holloway reporting that she used long walks in her neighborhood as a means of managing her stress and emotions); id. at 675 (same). The therapist's records also reflect numerous instances of her complimenting Holloway for using walking as a stress-reliever and urging her to continue to do so. See id. at 635, 639, 643, 645, 655, 665, 667, 685, 691, 853. It is well established that an ALJ may properly discount a treating physician's opinion if he or she finds it inconsistent with the physician's treatment notes or with other evidence in the record. See, e.g., Mays, 78 F. App'x at 813; Northington, 2018 WL 2159923, at *1 n.1; Smith, 961 F.

Supp. 2d at 643 (collecting cases). In the present case, the record contained sufficient evidence to support the ALJ's determination not to accept Dr. Ruth's opinion that Holloway could not sit for more than a total of two hours in an eight-hour workday.

Although the ALJ only accepted some of Dr. Ruth's opinion, she also did not accept Dr. Marmar's opinion that Holloway could sit for seven hours or stand for seven hours in a workday; findings that would be consistent with the ability to perform light work.[8] R. at 21, 24. Despite Dr. Marmar's relatively benign findings during physical examination, the ALJ reasoned that Holloway should be limited to sedentary work in light of her consistent treatment for back pain, including frequent injections, and her testimony regarding her symptoms and limitations.[9] See id. at 24. Holloway objects to the ALJ's RFC determination, however, on the ground that neither Dr. Ruth nor Dr. Marmar had opined specifically that she could sit for a total of six hours in a workday and accuses the ALJ of having determined that she could perform sedentary work that required her to do so improperly, solely through her own "lay analysis." Pl.'s Br. at 20.

This argument lacks substance. First, as discussed above, in rejecting Dr. Ruth's two-hour sitting limitation, the ALJ relied on other evidence in the record, including Dr. Ruth's treatment records, his prescription of only conservative treatment, Dr. Marmar's contrary opinion and Holloway's daily activities and not on her own "lay analysis." See R. at 24, 26. Second, as discussed supra in Section V(A), "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the

_____

[8]    Light work involves lifting no more than 20 pounds at a time for up to two-thirds of a workday and standing or walking for a total of approximately six hours in a workday. SSR 83-10, 1983 WL 31251, at *5.

[9]    The ALJ rejected Dr. Marmar's opinion that Holloway could only walk for a total of two hours in a workday because she found it inconsistent with his relatively benign clinical findings. R. at 24.

medical evidence is part of the ALJ's duties." Titterington, 174 F. App'x at 11. Because the

ALJ relied on the other evidence of record in determining not to adopt Dr. Ruth's opinion that

Holloway could not sit for more than two hours in a workday, Holloway's "lay analysis"

argument fails.[10]

---

[10]    Despite the body of case law in the Third Circuit cited supra in Section V(A), there is disagreement among district court judges in the Circuit regarding the extent to which an ALJ must base an RFC assessment on a medical opinion from a physician, with some courts relying on Doak, 790 F.2d 26, in holding that an ALJ must base his or her RFC determination on an opinion from a medical source. See, e.g., Phillips v. Berryhill, No. 15-5024, 2017 WL 2224931, at *4 (E.D. Pa. May 22, 2017); Wright v. Colvin, No. 1:14-cv-02350-SHR-GBC, 2016 WL 446876, at *16 (M.D. Pa. Jan. 14, 2016) ("The Third Circuit has continued to uphold the prohibition on lay reinterpretation of medical evidence, even when a state agency medical opinion indicates that the claimant is not disabled."), report and recommendation adopted, No. 1:14-cv-2350, 2016 WL 452142 (M.D. Pa. Feb. 4, 2016). In Doak, the Third Circuit found that where none of the evidence in the record (consisting of the plaintiff's testimony, three medical reports and the VE's testimony) suggested that the plaintiff could perform light work, the ALJ's conclusion that he could perform light work was not supported by substantial evidence. 790 F.2d at 28-29. However, as discussed in Section V(A), supra, more recent cases from the Third Circuit have made clear that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington, 174 F. App'x at 11; see also Chandler, 667 F.3d at 362 (An "ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision."); Mays, 78 F. App'x at 813 (ALJ properly determined that claimant could perform light work based on claimant's treatment records even though the only medical opinion in the case was to the contrary). In light of this more recent case law, other courts in this Circuit have determined that the ALJ is not prohibited from making an RFC assessment even if no doctor has specifically made the same findings. See, e.g., Meacham v. Saul, No. 18-5245, 2019 WL 4393080, at *11 (E.D. Pa. Sept. 13, 2019); Samah v. Comm'r of Soc. Sec., No. 17-08592 (RBK), 2018 WL 6178862, at *8 (D.N.J. Nov. 27, 2018); Cummings v. Colvin, 129 F. Supp. 3d 209, 215 (W.D. Pa. 2015); see also, e.g., Myers v. Berryhill, 373 F. Supp. 3d 528, 538 (M.D. Pa. 2019) ("Nothing in the Social Security Act or governing regulations requires the ALJ to obtain matching 'opinion' evidence in order to fashion a claimant's RFC."); Butler v. Colvin, No. 3:15-CV-1923, 2016 WL 2756268, at *13 n.6 (M.D. Pa. May 12, 2016) (citing Cummings with approval); Doty v. Colvin, No. 13-80-J, 2014 WL 29036, at *1 n.1 (W.D. Pa. Jan. 2, 2014) (rejecting a reading of Doak that would "prohibit the ALJ from making an RFC assessment even

(Footnote continued on next page)

Holloway challenges the accuracy of the ALJ's evaluation of the evidence, pointing primarily to Dr. Ruth's records regarding her own subjective complaints. See Pl.'s Br. at 4-5, 18. "[A] medical source does not transform [a] claimant's subjective complaints into objective findings simply by recording them . . . ." Hatton v. Comm'r of Soc. Sec., 131 F. App'x 877, 879 (3d Cir. 2005). Where, as here, R. at 22, an ALJ finds a claimant's testimony regarding the severity of his or her symptoms not credible, he or she may discount medical opinions that are based on the claimant's self-reporting of symptoms. Morris v. Barnhart, 78 F. App'x 820, 825 (3d Cir. 2003); Gartland v. Colvin, No. 3:13-cv-02668-GBC, 2015 WL 5695311, at *21 (M.D. Pa. Sept. 28, 2015); McCormick v. Comm'r of Soc. Sec., No. 12-227, 2013 WL 2187537, at *9 (W.D. Pa. May 21, 2013); Gilmore v. Barnhart, 356 F. Supp. 2d 509, 512-13 (E.D. Pa. 2005). Moreover, the fact that Holloway can point to some evidence that would support her position "does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 183, 186 (D.N.J. Oct. 25, 2016). Holloway essentially asks this Court to reweigh the evidence and reach a conclusion more favorable to her. This Court, however, is not authorized to reweigh the evidence de novo, Monsour Med. Ctr., 806 F.2d at 1190, but only to determine whether substantial evidence exists

---

if no doctor has specifically made the same findings and even if the only medical opinion in the record is to the contrary"). These cases have found that Doak merely acknowledged the well-established rule that the RFC assessment is a factual finding that must be made by the ALJ after reviewing all of the evidence in the record. See, e.g., Callahan v. Colvin, No. 13-1634, 2014 WL 7408700, at *1 n.1 (W.D. Pa. Dec. 30, 2014). Here, as discussed above, the ALJ's review of Holloway's treatment records, her daily activities and Dr. Marmar's report, provided substantial evidence to support the ALJ's determination that Holloway was capable of performing sedentary work. A number of courts have held that Doak does not apply when an ALJ relies on other evidence in the record to form an RFC. See, e.g., Meacham, 2019 WL 4393080, at *11; Armbruster, 2016 WL 5930913, at *7; Samah, 2018 WL 6178862, at *7.

to support the ALJ's finding, <u>Torres v. Barnhart</u>, 139 F. App'x 411, 413 (3d Cir. 2005). In this case, the ALJ identified sufficient evidence of record to meet that standard.

> ### C.     The ALJ's Determination that Holloway Did Not Meet the Requirements of Listings 12.04 or 12.05 Was Supported by Substantial Evidence

Holloway contends that the ALJ erred in failing to find that she satisfied Listing 12.04 of the Mental Disorder Listing, which applies to depressive, bipolar and related disorders, 20 C.F.R. pt. 404, subpt. P. app. 1 § 12.04, and Listing 12.05, which applies to intellectual disorders, <u>id.</u> § 12.05. Pl.'s Br. at 21-25. Neither argument is meritorious.

The United States Supreme Court has described the function of the listings as follows:

> The listings define impairments that would prevent an adult, regardless of his [or her] age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity and the statutory standard [for disability] is that . . . the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his [or her] impairment matches or is equivalent to a listed impairment, he [or she] is presumed unable to work and is awarded benefits without a determination whether he [or she] actually can perform his [or her] own prior work or other work.

<u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990) (emphasis in original). Because of their function to create a presumption of disability without further individual analysis, "[t]he [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard." <u>Id.</u> at 531. For the same reason, "[t]he Commissioner applies a heightened evidentiary standard for presumptive disability cases under the listings than for cases that proceed to other steps in the sequential evaluation process." <u>Lee v. Comm'r of Soc. Sec.</u>, 529 F. App'x 706, 710 (6th Cir. 2013). Under that standard, "[c]laimants bear the burden of establishing through medical evidence that their condition meets all the requirements of a listing," <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 120 n.2 (3d Cir. 2000), and the requirements of a listing are "strictly construed against claimants," <u>Lee v. Astrue</u>, No. 06-5167,

2007 WL 1101281, at *4 (E.D. Pa. Apr. 12, 2007); accord Eckenrode v. Colvin, No. 2:13-cv-231, 2014 WL 819955, at *8 (W.D. Pa. Mar. 3, 2014); Horne v. Comm'r of Soc. Sec., No. 2:13-cv-00226, 2014 WL 585927, at *6 (W.D. Pa. Feb. 14, 2014).

Listing 12.04 is divided into three categories. See 20 C.F.R. pt. 404, subpt. P. app. 1 § 12.00(A)(2). The first category, defining what are referred to as the "A criteria," sets out the medical criteria that must be present to establish that the claimant suffers from the particular impairment covered by the listing. See id. § 1200(A)(2)(a). The second category, referred to as the "B criteria," sets out the functional criteria used to evaluate how the mental impairment limits the claimant's functioning. See id. § 1200(A)(2)(b). The third category, referred to as the "C criteria," are not at issue in this action. In the present case, there is no dispute that Holloway satisfied the A criteria, establishing the presence of a depressive, bipolar or related disorder. The parties dispute, however, whether Holloway satisfied the B criteria for the listing.

To satisfy the B criteria, a claimant must establish that he or she suffers from an extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning:

1.    Understand, remember or apply information;

2.    Interact with others;

3.    Concentrate, persist, or maintain pace; and

4.    Adapt or manage oneself.

Id. § 12.04(B). The applicable regulations define an extreme limitation as existing when the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." Id. §1200(F)(2)(e). They define a marked limitation as existing when the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." Id. § 1200(F)(2)(d).

Although Listing 12.05 refers to a different mental health impairment than Listing 12.04—intellectual impairment—the criteria used to evaluate the functional limitations that intellectual impairment imposes on the claimant are the same as the B criteria of Listing 12.04. Compare id. §12.04(B) with id. §12.05(b)(2). Thus, to satisfy Listing 12.05, a claimant must establish that he or she suffers from:

1.    Significantly subaverage general intellectual functioning evidenced by a or b:

    a.    A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

    b.    A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.    Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    a.    Understand, remember, or apply information (see 12.00E1); or

    b.    Interact with others (see 12.00E2); or

    c.    Concentrate, persist, or maintain pace (see 12.00E3); or

    d.    Adapt or manage oneself (see 12.00E4); and

3.    The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

Id. §12.05(b).[11]

---

[11]    Listing 12.05(A) is not applicable in this case because it applies to claimants who lack the cognitive ability to participate in standardized testing and demonstrate significant deficits in

(Footnote continued on next page)

The ALJ recognized that Holloway satisfied the first paragraph of the listing because IQ testing performed by a consultative examiner, Dr. Joseph Primavera, determined that Holloway had a full-scale IQ of 53. R. at 20 (citing id. at 505).[12] Instead, the parties' dispute regarding whether Holloway satisfied Listing 12.05 also is focused on whether she sufficiently demonstrated that she suffered from significant deficits in adaptive function through an extreme limitation of one, or a marked limitation in two, of the same B criteria stated for Listing 12.04 above. The ALJ found that the evidence did not show that Holloway satisfied this requirement. Id. at 20-21.

In addition to a voluminous set of treatment notes, the record contained a single, joint set of responses to interrogatories from both of Holloway's treating mental health providers, psychiatrist, Dr. Theodore Wilf, and therapist, April Morgan, MSA, of the Warren E. Smith Health Centers ("WESHC"), id. at 737-44, the report of consultative examiner, Dr. Patrick McHugh, id. at 408-15, the intelligence evaluation by Dr. Primavera, id. at 503-09, and the opinions of State agency physicians, Dr. Shelley Ross and Dr. Melissa Franks, id. at 81-82, 84-86.

Dr. Wilf and therapist Morgan provided treatment for Holloway from August 19, 2015 through December 17, 2017. See id. at 381-406, 557-728, 810-87. They submitted a joint response to interrogatories and completed a form entitled "Medical Source Statement

---

adaptive function through dependence on others for personal needs, such as toileting, eating, dressing or bathing. 20 C.F.R. pt. 404, subpt. P. app. 1 § 12.05(A).

[12] The ALJ did not address the issue raised in Listing 12.05(3) regarding whether Holloway's intellectual limitation manifested before the age of 22 because she found that Holloway did not meet the B criteria. See R. at 20-21. The Commissioner does not argue here that Holloway's claim should be rejected on the ground that her mental impairment did not manifest before the age of 22. See Def.'s Br. (Doc. No. 16) at 19-20.

Concerning the Nature and Severity of an Individual's Mental Impairment" on June 2, 2017.  Id. at 737-44.  Of the 44 areas of mental functioning the form inquired about, Dr. Wilf and therapist Morgan opined that Holloway suffered marked limitations in 37 of them and moderate limitations in the remaining seven.  Id. at 740-43.  Thus, their opinion was that Holloway's ability to function independently, appropriately, effectively and on a sustained basis was "seriously limited (Accordingly not satisfactory . . .)" as to 37 of the mental abilities listed on the form and that it was "fair (but satisfactory in the normal competitive work environment . . .)" in the remaining seven abilities.  Id.  They further opined that Holloway's attendance would be "found unreliable" and that she would be off-task for 25 percent of the time that she was at work. Id. at 738-39.

Dr. McHugh conducted a consultative examination of Holloway on March 16, 2016.  Id. at 408-15.  In his mental status examination, he found Holloway to be cooperative, pleasant, adequately dressed and groomed, with appropriate motor behavior and eye contact.  Id. at 409-10.  He found her speech to be fluent and clear with adequate expressive and receptive languages.  Id. at 410.  He also found Holloway's thought processes to be coherent and goal-directed with no evidence of hallucinations, delusions or paranoia.  Id.  Dr. McHugh determined that Holloway was fully-oriented, her sensorium was clear and her insight and judgment were fair.  Id. at 410-11.  Holloway struggled to perform basic multiplication and erred in her first attempt at performing the "serial 3s."  Id. at 410.  However, Dr. McHugh also found her basic recall to be "much better," as she was able to remember all three items presented five minutes earlier, repeated four digits forward and three backwards, knew how many months and days were in a year and could name four recent presidents.  Id.  Holloway told Dr. McHugh that she could bathe and dress herself and that she "trie[d] to attend all other daily responsibilities, including

cleaning, shopping, and cooking, but receive[d] help when necessary from her mother when she [wa]s in too much discomfort." Id. at 411. She also reported that she could take public transportation unaccompanied and that she had travelled 45 minutes by public transportation to attend the examination. Id. at 408, 411. Dr. McHugh concluded that his evaluation results appeared to be "consistent with psychiatric problems that may significantly interfere with the claimant's ability to function on a daily basis." Id. at 411.

Along with his narrative report, Dr. McHugh completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." Id. at 413-15. Dr. McHugh opined that Holloway had no limitation in her abilities to understand, remember and carry out simple instructions; mild limitations in her abilities to understand, remember and carry out complex instructions and interact appropriately with the public and supervisors; and moderate limitations in her abilities to interact appropriately with coworkers and respond appropriately to usual work situations and changes in a routine work setting. Id. at 413-14. He also opined that Holloway's mental-health limitations had been present "lifelong." Id. at 414. Dr. McHugh concluded that Holloway was capable of managing her own funds. Id. at 411, 415. As an explanation for the ratings he had assigned, Dr. McHugh pointed to the fact that Holloway had admitted that prior to her physical injuries in 2015, she had still worked despite her mental-health limitations. Id. at 414.

Dr. Primavera performed his intelligence testing on Holloway on July 25, 2017, id. at 503-09, and found that Holloway had a full-scale IQ of 53, id. at 505. Dr. Primavera also submitted a Medical Source Statement of Ability to Do Work-Related Activities (Mental). Id. at 507-09. He rated Holloway's limitations in the abilities to: understand, remember and carry out simple instructions; make judgments on simple work-related decisions; and interact appropriately

with coworkers and supervisors as moderate. Id. at 507-08. Dr. Primavera rated Holloway's limitations in the abilities to: understand, remember and carry out complex instructions, make judgments on complex work-related decisions; interact appropriately with the public; and respond appropriately to usual work situations and changes in a routine work setting as marked. Id. Nevertheless, despite these limitations, Dr. Primavera also opined that Holloway would "benefit from vocational counseling and job placement services, such as those offered by the Office of Vocational Rehabilitation." Id. at 506. Thus, it is apparent that he did not believe that Holloway was incapable of performing any form of employment.

Two State agency physicians, Drs. Ross and Franks, conducted a review of the medical evidence regarding Holloway's mental impairments. Id. at 82, 84-86. Dr. Ross addressed whether Holloway's impairments met or medically equaled a listing, id. at 82, while Dr. Franks performed an analysis of Holloway's mental RFC, id. at 84-86.[13] In determining whether Holloway's mental impairments met a listing, Dr. Ross examined the B criteria of the Mental Disorder Listings. Id. at 82. Dr. Ross concluded that Holloway had: mild restrictions on her activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that she had not experienced any instances of decompensation.[14] Id.

In her RFC assessment, Dr. Franks found Holloway not to have significant limitations in her abilities to: carry out very short and simple instructions; carry out detailed instructions;

---

[13]     In her opinion, the ALJ mistakenly treated the State agency review of Holloway's mental-health impairment as having been conducted entirely by Dr. Ross. See R. at 25. This error has no effect on the outcome of this case.

[14]     Dr. Ross wrote her opinion on a form that addressed the B criteria as they existed prior to the 2017 revisions. See R. at 81-82; 20 C.F.R. § 404.1527.

perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; maintain socially-appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in public places or use public transportation; and set realistic goals or make plans independently of others. Id. at 85-86. Dr. Franks assessed Holloway as having moderate limitations in her abilities to: maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Id.

In determining whether Holloway met the requirements of Listing 12.04, the ALJ focused on the four B criteria of that listing. See id. at 18-19. She found that Holloway had mild limitations in understanding, remembering or applying information. Id. at 18. The ALJ recognized Holloway's poor school performance and enrollment in special education. Id. at 22. Nevertheless, she also noted that Holloway did graduate from high school despite her intellectual impairment. Id. In addition, she pointed to the fact that, between October 2013 and July 2015, Holloway worked successfully in a semi-skilled occupation as a home healthcare aide and only left that position because of the physical injuries she suffered in the bus accident. Id. at 20, 26; see also id. at 218 (reflecting that Holloway was employed by Burger King from 2010 to 2013).

The ALJ also indicated that, despite her mental impairments, Holloway was able to move from Williamsport, Pennsylvania to Philadelphia along with her young daughter to seek more structure, job opportunities, and housing resources.  Id. at 20 (citing id. at 402).  She also noted that Holloway remained able to care for her eight-year-old daughter, take public transportation, go shopping, handle her own finances and live independently.  Id. at 20, 22.  Moreover, despite Holloway's allegation that her condition affected her memory, understanding and ability to follow instructions, the ALJ gave examples of mental status examinations conducted in 2015 and 2016 which reflected that her memory was intact and thought processes coherent.  Id. at 18.  As a result, the ALJ determined that no greater than a finding of mild limitation in understanding, remembering or applying information was warranted.  Id.

In interacting with others, the ALJ determined that Holloway had moderate limitations. Id.  She acknowledged Holloway's claims that she had issues getting along with others and was easily agitated, and that Holloway had reported mood swings in 2016.  Id.  She also noted, however, that Holloway remained able to participate in public activities such as shopping and taking public transportation to her numerous doctor appointments and physical therapy.  See id. Moreover, Holloway also was able to maintain a job in food preparation at Burger King for more than two years.[15]  Id. at 218.  Although she was terminated from that position due to a confrontation with a coworker in October 2013, see id. at 399, she then obtained the semi-skilled position as a healthcare aide, which she performed successfully for about two years until her bus accident, id. at 46, 218, 399.  Holloway also reported to her therapist that she had gone out on a date.  Id. at 86.

---

[15]    In a 2015 intake interview at WESHC, Holloway stated that she had "to be good with people" because she worked in the fast-food industry.  R. at 398.

In concentrating, persisting or maintaining pace, the ALJ found that Holloway had moderate limitations.  Id. at 18.  She recognized that Holloway had testified that a lack of focus and concentration was one of her primary symptoms.  Id.  The ALJ pointed to mental status examination records, however, that indicated that Holloway's concentration was generally fair, although it was poor on some occasions.  Id. at 18-19.  She also noted, however, that typically, Holloway's mental status examinations had been unremarkable other than mood issues.  Id. at 25.  The ALJ reasoned that Holloway's ability to graduate from high school and maintain semi-skilled employment demonstrated that her concentration issues were not of a marked level.  Id. In addition, she found that the fact Holloway was only prescribed conservative mental-health treatment also was inconsistent with a finding of marked limitations.  Id. at 19.  On these bases, she accepted the opinion of Dr. Ross that Holloway had moderate limitations as to this criteria.[16] Id.

For the criteria of adapting or managing oneself, the ALJ determined that Holloway had mild limitations.  Id.  She noted that Holloway's insight and judgment were rated as fair throughout 2016, and that they generally were rated as fair throughout the relevant period, despite a few occasions when they were rated as poor.  Id.  She also found that the record did not establish that Holloway had severe issues regulating her emotions, controlling her behavior or making plans independently of others.  Id.

In reaching these conclusions, the ALJ afforded great weight to the opinion of consultative examiner, Dr. McHugh, who opined that Holloway suffered only from mild or moderate functional limitations in each of the B criteria.  Id. at 25 (citing id. at 413-14).  She also

---

[16]    The VE testified at the hearing that none of the jobs that she identified for Holloway required her to perform at a production pace.  See R. at 70, 74.

gave great weight to the opinion of State agency physician, Dr. Ross, who also opined that Holloway had no greater than moderate limitations in the B criteria. Id. (citing id. at 82).

Once again, Holloway argues that the ALJ was required to afford controlling weight to the opinion of her treating mental-health providers, Dr. Wilf and therapist Morgan. See Pl.'s Br. at 21-30. As discussed above, those providers opined that Holloway had marked limitations in 37 of the 44 mental abilities listed on the medical source statement form. Id. at 740-43. They further opined that Holloway's mental impairments precluded her from performing even simple unskilled work.[17] Id. at 738. The ALJ gave little weight to Dr. Wilf and therapist Morgan's opinion because she found the severe limitations they assigned to Holloway to be inconsistent with their own treatment notes, "which typically document normal mental status examinations other than some mood issues." Id. at 25. A review of Holloway's treatment records, including her weekly therapy sessions, confirms that the ALJ's characterization of those examinations is accurate. Throughout her treatment, Holloway's mental status examinations consistently reflected that she was cooperative, her hygiene and motor behavior were normal, her speech was clear and unimpaired, her memory, when it was rated, was rated intact or fair, and her eye contact was appropriate. See, e.g., id. at 389, 569, 571, 579, 588, 592, 619, 631, 673, 697, 703, 717, 725, 851. In addition, with only occasional exceptions, see, e.g., id. at 385, 727, 814, her thought content was rated intact and her thought processes, or cognition, were rated intact or goal-directed. See, e.g., id. at 392, 559, 569, 579, 625, 673, 697, 715, 818, 830, 855, 874. Similarly, although her judgment and insight were sometimes rated as impaired or poor, see, e.g., id. at 683, 727, 814, they generally were rated as intact or fair, see, e.g., id. at 385, 387, 559, 571,

---

[17]    Dr. Wilf and therapist Morgan also opined that Holloway would be off-task for 25 percent of each workday. R. at 739. They provided no explanation of the basis for that opinion. Id.

588, 590, 592, 627, 673, 697, 715, 725, 828. Moreover, as the ALJ noted, id. at 23, by mid-2016, Holloway's mood had stabilized, and it remained largely stable thereafter, id. at 635, 643, 653, 703, 715, 725, 826, 828, 832, 847, 851, 857, with occasional exceptions, see, e.g., at 649, 673, 818.[18]

In addition, it is also notable that for most of the therapy sessions in which Holloway received less than unremarkable examination ratings, she reported that her cognitive and emotional state were the result of conflict with her mother and sister and her dire financial straits. See, e.g., id. at 387, 401-02, 592, 594, 604, 727. Indeed, Holloway advised that family conflict was causing her emotional difficulties, id. at 387, 590, 627, and discussions of how to address the conflict were ubiquitous throughout her therapy records. Holloway and her eight-year-old daughter resided in her mother's home along with her mother, her sister, her sister's two children, and, at times, other relatives. Id. at 391, 401. She was frustrated by her inability to afford to move out of her mother's home. Id. at 633; see also id. at 583 (Holloway stating that "[o]nce I get out of the house I am living in I will be fine and probably less depressed"), 717 (Holloway reporting being stressed by living with her family); 727 (Holloway reporting being frustrated with family's inconsideration and complaining about finances). She believed that she was used and taken advantage of in her home, id. at 592, 598, 619, and that she received no support from her family, see id. at 387, 397, 401, 583, 592, 631. She also reported that she and her sister were like "oil and water," id. at 398, and complained that she was always left to clean up after her sister and supervise her sister's children. Id. at 401.

---

[18]   Viewed against this record, Holloway's assertion that the ALJ rejected the treating physicians' opinions in "reliance on a single mental status exam culled from an extensive medical record," Pl.'s Br. at 24, is incomprehensible.

Moreover, Holloway's treatment records also support the ALJ's view that her condition improved with treatment. Holloway had not been on medication for several years prior to her 2015 treatment at WESHC. See, e.g., id. at 396. She subsequently reported that she perceived the medication prescribed by Dr. Wilf as effective. Id. at 385, 390, 626. The goal of Holloway's therapy throughout her treatment was to develop and use coping techniques to help her stabilize her emotional state. See, e.g., id. at 383, 641, 681, 719. Coping techniques that she reported developing and using included guided imagery, id. at 611 (reporting that guided imagery "works for me"), mindfulness techniques, id. 653, journaling, id. at 604 (reporting that journaling "helps a lot"), id. 717, and taking long walks, id. at 635, 643, 675. Holloway's treatment notes contain numerous references to her condition improving with treatment. For example, on August 2, 2016, her therapist reported that she appeared to be overcoming her family relationship issues, financial constraints and other barriers by "using positive coping strategies adopted while in treatment." Id. at 663. On November 4, 2016, Holloway "reported feeling more emotionally stable and somewhat at ease lately since applying relaxation techniques obtained while in treatment." Id. at 693. Her therapist noted that Holloway's "thinking seems to be readjusting along with the incorporation of more positive coping strategies." Id. On November 29, 2016, her therapist noted that "[t]hings seem to be going well for [Holloway] and she seems to be responsive to treatment" and to be making "good progress." Id. at 701. Thus, the ALJ's determination that those mental status reports and therapy records were not consistent with the extreme limitations Dr. Wilf and therapist Morgan assigned to Holloway was supported by the evidence of record.

Holloway attempts to refute the ALJ's characterization of her mental status examinations by pointing to instances when her mental status reports were less than fully normal. See Pl.'s Br.

at 8-12.  In so doing, she relies heavily on sessions that took place early in her treatment, <u>see</u> <u>id.</u> at 8-10, and on individual subsequent appointments in which her mood was depressed and her affect was blunt or constricted, but her other mental status evaluation criteria were normal, <u>id.</u> at 10-11.  However, as discussed above, the earlier sessions occurred before Holloway's condition began to improve significantly with medication and therapy.  As for subsequent sessions in which Holloway suffered from a depressed mood and a constricted or blunted affect, those occasional setbacks do not overcome the significant improvement demonstrated by the record taken as a whole.  <u>Torres</u>, 139 F. App'x at 414 (relatively sporadic setbacks did not undercut the significance of the claimant's substantial improvement from psychotherapy treatment).  An ALJ who relies on a pattern of improvement despite instances of setbacks "does not improperly ignore treatment notes which contradicted [his or] her opinion, but rather assesse[s] those notes as a whole to reach [his or] her conclusion of substantial improvement."  <u>Id.</u>  The fact that the record may contain some evidence "that could support a finding of disability," is not controlling because "[a reviewing court's] inquiry is not whether the ALJ could have reasonably made a different finding based on this record," but "whether the ALJ's actual findings are supported by substantial record evidence."  <u>Simmonds v. Heckler</u>, 807 F.2d 54, 58 (3d Cir. 1986); <u>accord</u> <u>Malloy</u>, 306 F. App'x at 764.

Holloway also argues that the ALJ erred in basing her analysis in part on mental status examinations.  Pl.'s Br. at 24.  That argument is meritless.  Numerous courts have approved ALJs' reliance on unremarkable mental status evaluations as a basis for rejecting a mental health provider's opinion that a claimant suffers from marked or extreme functional limitations.  <u>See, e.g.</u>, <u>Wise</u>, 626 F. App'x at 360; <u>King v. Colvin</u>, No. 15-541, 2016 WL 5660231, at *3 (W.D. Pa. Sept. 29, 2016); <u>Deal v. Astrue</u>, No. 3:14-CV-1750, 2015 WL 3613318, at *9 (M.D. Pa. June 8,

2015); <u>Ohls v. Colvin</u>, No. 2:13-1277, 2014 WL 4925100, at *4 (W.D. Pa. Sept. 30, 2014);

<u>Havens v. Colvin</u>, No. 3:13-CV-00600, 2014 WL 4659957, at *12-13 (M.D. Pa. Sept. 17, 2014);

<u>Dulaney v. Colvin</u>, No. 2:13-CV-1240, 2014 WL 470060, at *7 (W.D. Pa. Feb. 6, 2014);

<u>McCormick v. Comm'r of Soc. Sec.</u>, No. 12-227, 2013 WL 2187537, at *9 (W.D. Pa. May 21,

2013); <u>Dunn v. Astrue</u>, No. 10-1551, 2011 WL 2580460, at *3 (W.D. Pa. June 28, 2011).

Holloway also criticizes the ALJ for relying on her ability to perform semi-skilled work

prior to the 2015 bus accident.  <u>See</u> Pl.'s Br. at 25.  That reliance was appropriate on this record

because Holloway performed that work despite the fact that she was suffering from very similar

symptoms.  <u>See</u> R. at 559-65.  The record reflects that Holloway received some unspecified level

of treatment in 2010 but abandoned it after two months because the medication made her "feel

funny."  <u>Id.</u> at 404.  She again sought treatment in 2013 and participated in the treatment long

enough to undergo a comprehensive biopsychosocial evaluation.  <u>See id.</u> at 559-65.  Her

reporting regarding the extent and severity of her symptoms in 2013 was consistent with the

reporting of those symptoms she gave when she next sought treatment again in 2015.  <u>See id.</u>

The fact that Holloway had been able to perform semi-skilled work successfully for almost two

years despite her symptoms, <u>id.</u> at 218, and that she only stopped working due to her injuries

suffered in the bus accident, <u>id.</u> at 46, certainly lends support to the ALJ's determination that her

mental impairments did not entirely preclude her from the kind of simple work, involving only

limited exposure to the public, coworkers and supervisors, that the ALJ found she remained able

to perform, <u>id.</u> at 21.

Additionally, Holloway contends that the ALJ erred in giving great weight to the

opinions of Drs. McHugh and Ross because they submitted their opinions in March and May of

2016, respectively, and did not have access to Holloway's medical records created after the dates

of their opinions.  Pl.'s Br. at 22-24.  As the Third Circuit explained in <u>Chandler</u>, however,

> because state agency review precedes ALJ review, there is always some time
> lapse between the consultant's report and the ALJ hearing and decision. The
> Social Security regulations impose no limit on how much time may pass between
> a report and the ALJ's decision in reliance on it. Only where "additional medical
> evidence is received that *in the opinion of the [ALJ]* ... may change the State
> agency medical ... consultant's finding that the impairment(s) is not equivalent in
> severity to any impairment in the Listing," is an update to the report required.

667 F.3d at 361 (citing SSR 96-6p (July 2, 1996 (emphasis in original)); <u>see also</u> <u>id.</u> (stating that

reliance on records which were "at most, a few years old" that addressed the deterioration of the

claimant's condition surrounding his or her disability onset date was appropriate, citing the fact

that the Third Circuit has "permitted reliance on records much older" (citing <u>Morales</u>, 225 F.3d

at 312-13 and <u>Hartranft</u>, 181 F.3d at 360-61)).

In this case, "in the opinion of the ALJ," the additional evidence received after the

consulting examiner and State agency physician submitted their opinions would not have

changed their findings.  That opinion was entirely reasonable because, as discussed above,

Holloway's condition improved considerably after the time those physicians submitted their

opinions.  Holloway places particular emphasis on the fact that Dr. Primavera's IQ testing had

yet to be performed as of that time, <u>see</u> Pl.'s Br. at 22, and cites to <u>Markle v. Barnhart</u>, 324 F.3d

182, 187 (3d Cir. 2003), for the proposition that the existence of previous work does not

necessarily establish that a person with intellectual limitations could not meet Listing 12.05.

Pl.'s Br. at 25.  <u>Markle</u>, however, dealt with the specific issue of whether an ALJ could reject an

IQ score as invalid based on a finding that it was inconsistent with the claimant's activities.  324

F.3d at 187.  Here, the ALJ did not reject Dr. Primavera's IQ testing results as invalid but,

instead, acknowledged that those results satisfied the IQ testing criteria of Listing 12.05.  <u>See</u> R.

at 20.  The four B criteria that the ALJ considered here, as she was required to do by 20 C.F.R.

pt. 404, subpt. P. app. 1 § 12.05, were not a part of the Listing-12.05 analysis at the time <u>Markle</u> was decided. <u>See</u> <u>Markle</u>, 324 F.3d at 187. Thus, under the regulations in force when <u>Markle</u> was decided, satisfying the B criteria was not a relevant consideration,[19] whereas, under the regulation in effect at the time of the ALJ's decision here, Holloway was required to satisfy those criteria to establish that her condition met the listing. 20 C.F.R. pt. 404, subpt. P. app. 1 § 12.05(B)(2). Holloway has failed to explain how knowing the precise IQ score associated with her intellectual impairment would have changed either Dr. McHugh's or Dr. Ross' opinions or would invalidate the ALJ's analysis of her mental-health treatment providers' opinion.

As stated above, it is the claimant's burden to prove that he or she meets all the requirements of a listing, and that the burden is particularly stringent. It is not this Court's role to "re-weigh the evidence of record and substitute [its] judgment as to whether [Holloway] is disabled under the Act for that of the ALJ." <u>Wilkinson</u>, 558 F. App'x at 256 (internal quotation marks omitted). Instead, this Court is limited to reviewing whether substantial evidence exists to support the ALJ's decision. <u>Monsour Med. Ctr.</u>, 806 F.2d at 1190-91. Particularly in light of the stringent standard applied to claims that a claimant meets a listing, Holloway has failed to show that the ALJ's determination that she did not meet the requirements of Listings 12.04 or 12.05 was not supported by substantial evidence.

**D.    <u>The ALJ Adequately Addressed Holloway's Obesity</u>**

In <u>Diaz v. Comm'r of Soc. Sec.</u>, the Third Circuit ruled that "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with [his or] her

---

[19]    Instead of requiring that a claimant satisfy the B criteria, the regulation in effect at the time <u>Markle</u> was decided required the claimant to establish that he or she had a physical or other mental impairment imposing additional and significant work-related limitations of function. 324 F.3d at 187.

impairments, on [his or] her workplace function at step three and at every subsequent step."  577

F.3d 500, 504 (3d Cir. 2009).  Here, Holloway contends that the ALJ did not fulfill that

requirement.  Pl.'s Br. at 26-28.  The <u>Diaz</u> court also stated, however, that "[t]he ALJ, of course,

need not employ particular 'magic' words" and is "not require[d] . . . to use particular language

or adhere to a particular format in conducting his [or her] analysis."  577 F.3d at 504.

Subsequent case law has further refined the scope of an ALJ's duty to discuss the effects of

obesity.  "[W]hen an ALJ considers the role of a claimant's obesity, evaluating it within the

context of the overall record, consistent with the appropriate guidelines, this duty is satisfied."

<u>Tanner v. Berryhill</u>, No. 1:18-CV-1433, 2019 WL 2184767, at *7 (M.D. Pa. May 21, 2019)

(citing <u>Woodson v. Comm'r of Soc. Sec.</u>, 661 F. App'x 762, 765 (3d Cir. 2016)); <u>Medina v.</u>

<u>Berryhill</u>, No. 3:17-CV-1941, 2018 WL 3433290, at *7 (M.D. Pa. June 8, 2018) (also citing

<u>Woodson</u>), <u>report and recommendation adopted</u>, No. 3:17-1941, 2018 WL 3426408 (M.D. Pa.

July 16, 2018).  Furthermore, an ALJ who "explicitly considers the claimant's obesity when

assessing that claimant's residual functional capacity" has satisfied <u>Diaz</u>'s requirement.  <u>Tanner</u>,

2019 WL 2184767, at *7 (citing <u>Hoyman v. Colvin</u>, 606 F. App'x 678, 680 (3d Cir. 2015));

<u>Mowery v. Berryhill</u>, No. 4:17-CV-02149, 2018 WL 6991258, at *11 (M.D. Pa. Dec. 3, 2018)

(stating the same holding also in reliance on <u>Hoyman</u>), <u>report and recommendation adopted</u>, No.

4:17-CV-2149, 2019 WL 162525 (M.D. Pa. Jan. 10, 2019).  Thus, "a statement by an ALJ in a

decision denying benefits that the ALJ has 'considered any additional and cumulative effects of

obesity,' when coupled with even a brief factual analysis of the medical evidence as it relates to

obesity and impairment, is sufficient to satisfy this duty of articulation."  <u>Tanner</u>, 2019 WL

2184767, at *7 (quoting <u>Cooper v. Comm'r of Soc. Sec.</u>, 563 F. App'x 904, 911 (3d Cir. 2014));

<u>accord</u> <u>Medina</u>, 2018 WL 3433290, at *7.

In the present case, the ALJ discussed Holloway's obesity multiple times in her decision. In her step-three analysis, the ALJ first cited to SSR 02-1, 2002 WL 34686281 (Sept. 12, 2002), upon which Holloway seeks to rely, Pl.'s Br. at 26. R. at 17. The ALJ noted that there is no specific listing for obesity and stated that she considered obesity as an aggravating factor to Holloway's other severe impairments. Id. In step four of her analysis, in discussing the evidence that led to her RFC formulation, the ALJ specifically addressed Holloway's obesity. She stated Holloway's height and her highest weight on record and recognized that Holloway's body mass index ("BMI") at that time was 64. Id. at 23. She also noted that her BMI met the definition of "obesity class one" according to the medical criteria set forth by the National Institute of Health. Id. (citing National Institute of Health, NIH Publication No. 98-4083, p. xiv (September 1998)). The ALJ also discussed the evidence that an examination conducted in May 2016 reflected that "she had been unable to lose a significant amount of weight," id., but that by the time of the administrative hearing, Holloway had lost about 30 pounds, id. at 21-22. In addition, she discussed treatment notes from Holloway's primary care physician from an examination in January 2017, which stated that Holloway had "obesity, class 1," id. at 23 (citing id. at 534). Her doctor noted that she "was trying to make better dietary choices" but had no exercise program and that she "did make [a] consultation with bariatrics." Id. at 533. The ALJ also noted, however, that at the same visit, Holloway's primary care physician reported that she had indicated that she was "feeling well," and that "a physical examination found her musculoskeletal system normal." Id. at 23 (citing id. at 533 (finding "no joint pain, no muscle pain")); see also id. at 535 (noting that Holloway had a "normal range of motion" and "normal strength").

After discussing Holloway's weight at the time of the hearing, the ALJ acknowledged her testimony that "sitting more than one-half an hour, standing more than twenty to thirty minutes, walking more than one-and-a-half blocks, or lifting more than ten to fifteen pounds w[ould] aggravate her [back] pain." Id. at 22. The ALJ found, however, that Holloway's testimony concerning the limiting effects of her physical condition "were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Id. In the ensuing explanation, the ALJ not only cited to Holloway's weight and BMI, but discussed the opinions of her physicians regarding her physical limitations, which were based in part on her BMI. See id. at 24.

Thus, the ALJ considered the opinion of Holloway's orthopedist, Dr. Ruth, who responded affirmatively to an interrogatory asking "[i]s the pain the patient suffers on weightbearing activities such as standing or walking or lifting and carrying exacerbated by her weight." Id. at 731. She recognized that Dr. Ruth opined that in an eight-hour workday, Holloway could only stand for a total of one hour, sit for one hour and lift only 10 pounds. Id. at 24. She afforded Dr. Ruth's opinion only partial weight because she found that "the clinical findings in evidence document she has a normal gait and the diagnostic imaging revealed only mild to moderate issues." See id. The ALJ also discussed the results of the consultative examination by Dr. Marmar. Id. Dr. Marmar noted Holloway's height and weight, id. at 418, and that she was "extremely obese," id. at 419. Nevertheless, his clinical examination of Holloway was consistent with the ALJ's view of the evidence. He found that Holloway "appeared to be in no distress," her gait was normal, she could walk on her heels and toes and could perform "about 40% of a full squat." Id. at 418. Dr. Marmar noted that Holloway did not use an assistive device in walking, that she "[n]eeded no help changing for exam or getting on

38

and off exam table" and that she was "able to rise from chair without difficulty." Id. at 419. Dr. Marmar also found that her seated leg-raise test was negative bilaterally, that her joints were "stable and nontender" and that she had no redness, heat or effusion in them. Id. Dr. Marmar found that Holloway had "5/5" strength in her upper and lower extremities. Id.

In summarizing her findings as to Holloway's physical limitations, the ALJ recognized that Holloway's records reflected "persistent back pain" but also that her treatment had been limited to medication, physical therapy and lumbar injections but had not included surgery. Id. at 26. She also noted that Holloway's gait was typically found to be normal on examination. Id. The ALJ concluded that "[a]s such, considering her subjective allegations, she would be limited to sedentary exertion work." Id.

Thus, the ALJ here appropriately "consider[ed] the role of [Holloway's] obesity, evaluating it within the context of the overall record, consistent with the appropriate guidelines." Tanner, 2019 WL 2184767, at *7. The ALJ also met the Diaz requirement by discussing Holloway's weight and the results of her clinical examinations and determining that Holloway's RFC should be limited to sedentary work. See id. That the ALJ did not expressly state in her summary of her findings that her determination of Holloway's RFC as limited to sedentary work was based on the combination of Holloway's lumbar spine impairment and her obesity does not demonstrate that she did not adequately consider Holloway's obesity. See Diaz, 577 F.3d at 504 ("[T]he ALJ, of course, need not employ particular 'magic' words" and is "not require[d] . . . to use particular language or adhere to a particular format in conducting his [or her] analysis."). As one court in this Circuit explained:

> Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment. . . . The ALJ's failure to explicitly delineate where obesity may have caused or contributed to specific symptoms and

functional limitations does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations.

McKean v. Colvin, 150 F. Supp. 3d 406, 417 (M.D. Pa. 2015) (citations omitted). For these reasons, Holloway's obesity argument fails.

### E. Holloway's Evidence Submitted After the Hearing Does Not Warrant Remand

After the ALJ had issued her opinion, Holloway submitted additional evidence consisting of a 2018 MRI of her left knee taken after the hearing. R. at 2, 34-35. That MRI revealed that Holloway's left knee impairment consisted of a "5 mm osteochondral defect of the patella," prepatellar bursitis and a horizontal tear of the lateral meniscus. Id. at 35. The ALJ had before her at the time of her decision an x-ray of Holloway's knee taken in September 2017 that "revealed minimal compartment narrowing but was otherwise unremarkable," and a Doppler study that was "unremarkable." Id. at 24. She addressed those test results in her discussion of the evidence regarding Holloway's physical limitations. Id. Holloway did not submit any additional evidence along with the MRI to show that a more specific diagnosis of her knee impairment mandated any change in her treatment or her activities or to explain how the MRI undermined the ALJ's RFC determination. The Appeals Council "found that the [MRI] evidence d[id] not show a reasonable probability that it would change the outcome of the decision" and it "did not exhibit this evidence." Id. at 2. That conclusion was a reasonable one. In determining Holloway's RFC, the ALJ relied heavily on the results of Holloway's clinical evaluations, her conservative treatment and her activities of daily living. See id. at 24, 26. Holloway has failed to demonstrate why a more specific understanding of the diagnosis of her knee impairment was reasonably likely to change the ALJ's determination that she could perform sedentary work. See McKean, 150 F. Supp. 3d at 417 ("Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere

diagnosis of the disease or name of the impairment."). This Court finds no basis for remanding the case for a review of the 2018 MRI.

## VI.     <u>CONCLUSION</u>

For the reasons set forth above, I find that the ALJ's decision is supported by substantial evidence. Accordingly, Plaintiff's Request for Review is denied. An appropriate order follows.

Dated: December 30, 2019

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE